No. 24-40137

# United States Court of Appeals
# for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

V.

ALI DANIAL HEMANI,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
No. 4:23-CR-18-1

BRIEF FOR APPELLANT UNITED STATES OF AMERICA

Damien M. Diggs
 United States Attorney
 Eastern District of Texas

Bradley Visosky
 Assistant United States Attorney
 101 E. Park Boulevard, Suite 500
 Plano, Texas 75074
 (972) 509-1201

ATTORNEYS FOR THE UNITED STATES

## Statement Regarding Oral Argument

In the government's view, oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs and record. *See* Fed. R. App. P. 34(a)(2)(C).

# Table of Contents

**Page(s)**

Statement Regarding Oral Argument ....................................................i

Table of Authorities ................................................................ iii

Statement of Jurisdiction...........................................................1

Statement of the Issue ..............................................................1

Statement of the Case...............................................................1

Summary of the Argument.......................................................5

Argument..................................................................................5

Conclusion ..............................................................................35

Certificate of Service ..............................................................36

Certificate of Compliance ......................................................36

# Table of Authorities

**Federal and State Cases** **Page(s)**

*Andrus v. Texas,*
    140 S. Ct. 1875 (2020)...........................................................25

*Bell v. Cone,*
    535 U.S. 685 (2002)...........................................................25

*Buford v. United States,*
    532 U.S. 59 (2001)...........................................................25

*Dickerson v. New Banner Institute, Inc.,*
    460 U.S. 103 (1983)..................................................... 23, 29

*District of Columbia v. Heller,*
    554 U.S. 570, 635 (2008)........................................... *passim*

*Florence v. Board of Chosen Freeholders,*
    566 U.S. 318 (2012)...........................................................24

*Harmelin v. Michigan,*
    501 U.S. 957 (1991)................................................. 24, 25, 27

*Johnson v. United States,*
    576 U.S. 591 (2015)...........................................................27

*Kendall v. Ewert,*
    259 U.S. 139 (1922)..................................................... 32-33

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)...........................................................29

*Michigan v. Summers,*
    452 U.S. 692 (1981)...........................................................26

*Muscarello v. United States*,
  524 U.S. 125 (1998) ........................................................................27

*National Treasury Employees Union v. Von Raab*,
  489 U.S. 656 (1989) ................................................................. 28, 29

*Patterson v. Winn*,
  5 Pet. 233 (1831) ............................................................................19

*Ramirez v. Collier*,
  142 S. Ct. 1264 (2022) ...................................................................25

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) ...................................................................34

*Richards v. Wisconsin*,
  520 U.S. 385 (1997) ........................................................................27

*Rosemond v. United States*,
  572 U.S. 65 (2014) ..........................................................................27

*Smith v. Texas*,
  543 U.S. 37 (2004) ..........................................................................25

*Smith v. United States*,
  508 U.S. 223 (1993) ...................................................................6, 28

*State v. Hogan*,
  58 N.E. 572 (1900) .........................................................................22

*State v. Shelby*,
  2 S.W. 468 (1886) ...........................................................................22

*United States v. Augustin*,
  376 F.3d 135 (3d Cir. 2004) .............................................................7

*United States v. Bowens*,
  938 F.3d 790 (6th Cir. 2019) ............................................................7

*United States v. Cook*,
970 F.3d 866 (7th Cir. 2020) ............................................................7, 16

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023) .................................................... *passim*

*United States v. Dugan*,
657 F.3d 998 (9th Cir. 2011) ................................................................28

*United States v. Marceau*,
554 F.3d 24 (1st Cir. 2009) ...................................................................7

*United States v. McCowan*,
469 F.3d 386 (5th Cir. 2006) .................................................................7

*United States v. Patterson*,
431 F.3d 832 (5th Cir. 2005) ................................................................27

*United States v. Purdy*,
264 F.3d 809 (9th Cir. 2001) .................................................................7

*United States v. Seay*,
620 F.3d 919 (8th Cir. 2010) ................................................................28

*United States v. Yancey*,
621 F.3d 681 (7th Cir. 2010) .............................................. 27, 28, 30

*Wong v. Belmontes*,
558 U.S. 15 (2009)..............................................................................25

## Statutes and Rules

1 Mo. Rev. Stat ....................................................................................21

18 U.S.C. § 922(g)(3).............................................................. *passim*

21 U.S.C. § 801 .....................................................................................7

21 U.S.C. § 802(6) .................................................................................8

21 U.S.C. § 812(c) ........................................................................8

21 U.S.C. § 844(a) ........................................................................8

Massachusetts Constitution of 1780 .......................................12

Pub. L. No. 99-308 .....................................................................23

Pub. L. No. 103-322 ...................................................................23

Fed. R. App. P. 32(a)(6) ............................................................36

Fed. R. App. P. 32(a)(7)(B) ......................................................36

Fed. R. App. P. 32(f) ..................................................................36

Fed. R. App. P. 32(g) .................................................................36

1876 Ga. Laws 112 .....................................................................21

1878 Miss. Laws 175 ..................................................................21

1878 N.H. Laws 170 ...................................................................21

1879 N.C. Sess. Laws 355 .........................................................21

1879 Ohio Laws 192 ...................................................................21

1881 Pa. Laws 111 ......................................................................21

1882 Md. Laws 656 .....................................................................21

1883 Kan. Sess. Laws 159 .........................................................21

Del. Laws 225 (1879)..................................................................21

Del. Laws 716 (1881)..................................................................21

New Hampshire 460 (1815)........................................................20

Pub. L. No. 87-342 .................................................................................22

Pub. L. No. 90-618 .................................................................................22

Pub. L. No. 104-208 ...............................................................................23

## STATEMENT OF JURISDICTION

The government appeals the district court's grant of Ali Danial Hemani's amended motion to dismiss the indictment, charging a violation of 18 U.S.C. § 922(g)(3). The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b).

## STATEMENT OF ISSUE

Whether 18 U.S.C. § 922(g)(3), which prohibits anyone "who is an unlawful user of or addicted to any controlled substance" from possessing a firearm, violates the Second Amendment as applied to Hemani. The government concedes that this issue is currently foreclosed by this Court's decision in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023).

## STATEMENT OF THE CASE

Ali Danial Hemani, a dual citizen of the United States and Pakistan, was 25 years old at the time of the detention hearing in this case. ROA.441. He lives with his parents in their home in Lewisville, Texas. ROA.361. American law enforcement discovered concerning information from Hemani's phone at a border crossing in 2019 — communications on the phone showed that Hemani "was poised to commit fraud in order to interfere with the financial systems in the United States" at the direction of those suspected to be affiliated with the Islamic Revolutionary Guard Corps, which the United States government labeled as a

terrorist organization in 2019. ROA.415-16. The phone also contained information expressing various anti-American sentiments. ROA.417.

Other actions by Hemani and his family have drawn the attention of the FBI. These include, but are not limited to: that Hemani's brother, Mohammad, with whom Hemani maintains weekly contact, attends an Islamic University in Iran that the United States government has designated as having ties to terrorism, ROA.362-64; that sometime in or around February 2020, Hemani and his parents traveled to Iran to participate in a "very widely attended celebration" of the life of Quasem Soleimani (who had been killed by an American drone strike the month before), where Hemani's mother, Sameena, was captured on video telling an Iranian news organization that she prayed that her two sons — Hemani and Mohammad — would become martyrs like Soleimani, ROA.365-372; that the Hemani family, while traveling, engages in tradecraft and other counter-surveillance techniques in an effort to confuse law enforcement and make it harder to track them, ROA.418-422; and that Hemani himself told law enforcement that if he knew about an imminent attack or any terrorist activity where innocent people would be killed, he would not report it to the United States or any authority if it involved "a Shia brother", ROA.422-23.

Through a review of Hemani's phone, law enforcement discovered that Hemani was both a user and seller of promethazine. ROA.378-79. Hemani

admitted to liking the drug and finding it addictive. ROA.378-79. In August 2022, law enforcement got a search warrant and searched the home where Hemani lives with his parents. ROA.378-380, 383. Agents found a firearm (a Glock 9 millimeter), along with around 60 grams of marijuana and a usable quantity of cocaine (around 4.5 grams). ROA.379-80. The cocaine was found in Sameena's room, ROA.397-98, but Hemani admitted to the FBI that it was his, ROA.398. Hemani also told the FBI that he used marijuana about every other day. ROA.380-81. The firearm that was found was registered to Hemani, and he surrendered it to the FBI. ROA.381-82.

A grand jury charged Hemani with one count of possession of a firearm (A Glock 19, 9mm pistol, serial number BRWX640) by a user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). ROA.12-13. Hemani originally filed a motion to dismiss the indictment on the ground that 18 U.S.C. § 922(g)(3) is unconstitutional on its face. ROA.28-40. After briefing, a magistrate judge recommended to the district court that it grant the motion and find 18 U.S.C. § 922(g)(3) unconstitutional. ROA.224-252.

Shortly after the magistrate judge issued her report and recommendation, this Court decided *United States v. Daniels*, 77 F.4th 237 (5th Cir. 2023). The government filed objections to the report and recommendation, taking account of *Daniels*. ROA.272-279. The government pointed out that the *Daniels* panel

emphasized the "narrowness" of its holding, making clear that it did "not invalidate [Section 922(g)(3)] in all its applications, but importantly, only as applied to Daniels." ROA.272 (quoting *Daniels*, 77 F.4th at 355). The government further pointed out that Hemani, as the magistrate judge had found, did not assert an as-applied challenge to Section 922(g)(3) but rather a facial one, and neither *Daniels* nor the magistrate judge's report and recommendation supported finding Section 922(g)(3) unconstitutional across the board. ROA.272-279.

The government's objections prompted Hemani to file an amended motion to dismiss, this time arguing that Section 922(g)(3) was unconstitutional as applied to him. ROA.292-297. Because this case could not meaningfully be distinguished from *Daniels* on an as-applied basis, the government folded its tent in response, conceding that under *Daniels* dismissal of the indictment was appropriate but preserving its argument that *Daniels* was wrongly decided and that Section 922(g)(3) is valid under the Second Amendment. ROA.299-300.

The parties later submitted an agreed order of dismissal to the court, which the court entered. ROA.347-48. In the order the court granted Hemani's amended motion to dismiss and dismissed the indictment but made clear that "[t]he government preserves its right to file a notice of appeal in this case and preserves the argument that *Daniels* was wrongly decided and that 18 U.S.C. § 922(g)(3) is

valid as applied to Hemani." ROA.348. The government timely filed its notice of appeal on February 29, 2024. ROA.349.

## SUMMARY OF ARGUMENT

The government concedes that its argument that Section 922(g)(3) is constitutional as applied to Hemani is currently foreclosed by this Court's decision in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), which involved a similar fact pattern. But the government files this brief to preserve review, particularly in view of the Supreme Court's forthcoming decision in *United States v. Rahimi*, No. 22-915, and its expected disposition of the pending petition for writ of certiorari in *Daniels*, No. 23-376, 2023 WL 6623655 (Oct. 5, 2023). If the Supreme Court's decision in either of those cases affects the issues involved in this appeal, the government would respectfully ask this Court for an opportunity to provide appropriate supplemental briefing.

## ARGUMENT

## Standard of Review

We recognize that *Daniels* currently forecloses the following argument, but we present it to preserve for review that *Daniels* was wrongly decided and that Section 922(g)(3) is constitutional as applied to Hemani.

**Discussion**

"[D]rugs and guns are a dangerous combination." *Smith* v. *United States*, 508 U.S. 223, 240 (1993). The physiological effects of illegal drugs may impair drug users' ability to handle firearms safely. Drug users also often use firearms to commit crimes that fund their drug habit, to engage in violence in the course of drug deals, to endanger police officers who are investigating their drug crimes, and to commit suicide.

In Section 922(g)(3), Congress sought to address those problems by disarming regular drug users and drug addicts. That prohibition lasts only as long as a person remains a regular user or addict; an individual can regain his ability to possess firearms by stopping his illegal drug abuse. This Court, however, concluded in *Daniels* that Section 922(g)(3) violates the Second Amendment. Although the Court stated that it had invalidated the statute only as applied to Daniels, the concurrence understood the Court's reasoning to imply that "most, if not all, applications of § 922(g)(3) will likewise be deficient." 77 F.4th at 357 (Higginson, J., concurring).

Respectfully, this Court's holding in *Daniels* was mistaken. The Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens, and Section 922(g)(3) falls comfortably within that principle.

Section 922(g)(3) makes it a crime for a person to possess a firearm if he "is an unlawful user" of "any controlled substance." 18 U.S.C. § 922(g)(3). The courts of appeals that have considered the issue have uniformly agreed that the word "user" refers to someone who engages in the regular use of a controlled substance.[1] And a "controlled substance" is a drug or other substance that is listed in one of the schedules of the Controlled Substances Act, 21 U.S.C. § 801 *et seq. See* 18 U.S.C. § 922(g)(3); 21 U.S.C. § 802(6). Marijuana, the principal drug at issue here,[2] is a controlled substance. 21 U.S.C. § 812(c), Schedule I(c)(10). Simple possession of marijuana is a misdemeanor, and possession after a previous conviction for a drug offense is a felony. 21 U.S.C. § 844(a). The Second Amendment allows Congress to disarm the unlawful drug users covered by Section 922(g)(3), including Hemani.

**1.　Congress may disarm unlawful drug users because they are not law-abiding, responsible citizens.**

The Supreme Court has explained that the right to keep and bear arms belongs only to "law-abiding, responsible citizens." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). And in *NYSRPA v. Bruen*, 142 S. Ct. 2111 (2022), the

---

[1] *See United States* v. *Marceau*, 554 F.3d 24, 30 (1st Cir.), cert. denied, 556 U.S. 1275 (2009); *United States* v. *Augustin*, 376 F.3d 135, 138-139 (3d Cir. 2004); *United States* v. *McCowan*, 469 F.3d 386, 392 (5th Cir. 2006); *United States* v. *Bowens*, 938 F.3d 790, 793-794 (6th Cir. 2019), cert. denied, 140 S. Ct. 814, and 140 S. Ct. 2572 (2020); *United States* v. *Cook*, 970 F.3d 866, 874 (7th Cir. 2020); *United States* v. *Purdy*, 264 F.3d 809, 812 (9th Cir. 2001).

[2] Though Hemani admitted to using cocaine, and evidence showed that he also used and sold promethazine and found it addicting, the only drug that the available evidence shows that he regularly used (based on his own admission) was marijuana, *see above* at pp. 2-3.

Court stated that the Second Amendment protects the right of "an ordinary, law-abiding citizen" to possess and carry arms for self-defense. *Id*. at 2122. Those descriptions suggest that the government may properly disarm citizens who are dangerous, irresponsible, or unlikely to abide by the law. That category includes persons whose possession of firearms would endanger themselves or others.

> **2.    History confirms that Congress may disarm persons who are not law-abiding, responsible citizens.**

The Second Amendment's history illuminates its meaning. *See Bruen,* 142 S. Ct. at 2128-2129. Because the Amendment "codified a right inherited from our English ancestors," a court should begin with English law. *Id.* at 2127 (citation omitted). Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider evidence of how the Founding generation understood the right. *Id.* at 2136 (citation and emphasis omitted). And because evidence of the "public understanding of a legal text in the period after its enactment or ratification" is probative of original meaning, a court should consider how the Second Amendment was understood in the 19th century. *Heller,* 554 U.S. at 605 (emphasis omitted); *see Bruen,* 142 S. Ct. at 2136-2138. Historical evidence from each of those eras — before, at, and after the Founding — leads to the same conclusion: Congress may disarm persons who are not law-abiding, responsible citizens.

*Pre-Founding.* Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Ibid.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Ibid.*

While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It thus did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." 14 Car. 2, c. 3, § 13 (Eng.). Consistent with the Militia Act, the Crown often directed local officials to disarm those whom it did not trust to use weapons responsibly — for instance, those who had "disturbed the public Peace."[3] That practice continued after the adoption of the English Bill of Rights.[4] Indeed, many 18th-century justice-of-the-peace manuals

---

[3] Privy Council to Lord Newport (Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society,* pt. 2, 3d ser., vol. 4, at 156 (1904); see, *e.g., Calendar of State Papers, Domestic Series, Charles II, 1661-1662,* at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670,* at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1, 1684–February 5, 1685,* at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons").

[4] *See,* e.g., *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700-8 March, 1702,* at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to

recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[5]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen,* 142 S. Ct. at 2139-2142. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons.[6] The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

The understanding that the government could lawfully disarm irresponsible subjects remained intact at the time of the American Revolution, as one widely discussed episode illustrates. In 1780, London officials reacted to widespread

---

disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

[5] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.,* Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[6] *See, e.g.,* 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

rioting by confiscating the rioters' arms. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-131 (1994). The House of Lords debated — and rejected — a motion declaring that the confiscation violated the English Bill of Rights. *See id.* at 131-132. Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[7] The press similarly distinguished "the riotous mob" from "citizens of character."[8] And private groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects."[9]

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller,* 554 U.S. at 593, that

---

[7] *See, e.g.,* 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803,* at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

[8] 49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780); see, *e.g.,* 42 *The Scots Magazine* 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens").

[9] *See* 2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780,* at 139 (1780) (resolutions adopted in York); 1 *The Remembrancer; or Impartial Repository of Public Events, for the Year 1781,* at 24 (1780) (resolutions adopted in Middlesex); *id.* at 112 (resolutions adopted in Huntingdonshire).

background strongly suggests that the Second Amendment likewise allows Congress to disarm individuals who are not law-abiding, responsible citizens.

*Founding era.* Many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." In 1780, for example, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780,* at 624 (Oscar Handlin & Mary Handlin eds., 1966). The town explained: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Law-full Subjects of Government* we Ought Never to be deprived of them." *Ibid.* (emphasis added).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals."* 2 The Documentary History of the Ratification of the Constitution (Documentary History) 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller,* 554 U.S.

at 604. A contemporary commentator, discussing the proposal, agreed that Congress should have the power to disarm individuals who posed a "real danger of public injury." Nicholas Collin, *Remarks on the Amendments to the Federal Constitution … by a Foreign Spectator,* No. 11 (Nov. 28, 1788), *in* Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights 40 (Stanton D. Krauss ed., 2019).

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens,* from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). A contemporary described the proposal as an effort to protect "the right of *peaceable citizens* to bear arms." Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. *Ibid.*

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller,* 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely

understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-605. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

***Post-Founding.*** Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope. Not every commentator who discussed the right specifically addressed the government's power to disarm certain individuals — just as not every commentator specifically discussed its power to prohibit dangerous and unusual weapons or to bar carrying weapons in sensitive places. But the commentators that did address the issue confirmed that the government may disarm those who are not responsible or law-abiding.

For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably,* is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Ibid.* (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men*

*of Rhode Island,* Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime, in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

Opponents of slavery voiced similar views during the Bleeding Kansas conflict of the mid-1850s. On the one hand, they supported disarming groups responsible for violence in Kansas. Senator (and future Vice President) Henry Wilson, for instance, complained that "armed bandits" were "violating law, order, and peace," and called for legislation "to disarm any armed bands, from the slave States or the free States, who enter the Territory for unlawful purposes." Cong. Globe App., 34th Cong., 1st Sess., 1090 (Aug. 7, 1856). Senator Benjamin Wade likewise called on Congress to "[d]isarm these lawless bands." *Id.* at 1091. On the other hand, opponents of slavery criticized Kansas authorities for disarming "peaceable" free-state settlers.[10] A petition published in William Lloyd Garrison's

---

[10] *See*, *e.g.,* New-York Daily Tribune, Oct. 2, 1856, at 4 ("When [a Kansas official] entered the houses of peaceable citizens and demanded that they should deliver up their arms, he *** violated one of those provisions of the Constitution which a free people should guard with the most jealous care."); *High-Handed Outrage in Kansas,* Holmes County Republican, Oct. 30, 1856, at 1 (denouncing the disarmament of "[peaceable American [c]itizens" in Kansas as a violation of their "constitutional rights").

newspaper even urged the impeachment of President Pierce for his efforts to

disarm "peaceable citizens." A.J. Grover, *Impeachment of Franklin Pierce* (Aug. 1,

1856), *in* The Liberator, Aug. 22, 1856, at 140.

Sources during the Civil War reflect the same understanding. In 1863, a

Union general ordered that "all loyal and peaceable citizens in Missouri will be

permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86

(Aug. 25, 1863), *in The War of the Rebellion: A Compilation of the Official*

*Records of the Union and Confederate Armies,* ser. 1, vol. 22, pt. 2, at 475 (1888).

A war memoir recounted a Union soldier's belief that "it was unconstitutional to

disarm peac[e]able citizens." *Chickasaw, The Scout, in* R.W. Surby, *Grierson*

*Raids* 253 (1865). And after the war, Senator Henry Wilson defended Congress's

"power to disarm ruffians or traitors, or men who are committing outrages against

law or the rights of men." Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern States sought to disarm Black

citizens, prompting "an outpouring of discussion" about the right to keep and bear

arms. *Heller,* 554 U.S. at 614. Participants in that discussion affirmed the right to

possess arms for self-defense, yet cautioned that the right protected only

"peaceable" or "well-disposed" citizens. In Georgia, for example, the Freedmen's

Bureau issued a circular explaining that "[a]ll men, without distinction of color,

have the right to keep arms," but that "[a]ny person, white or black, may be

disarmed if convicted of making an improper and dangerous use of arms." H.R. Exec. Doc. No. 70,39th Cong., 1st Sess. 65 (1866). The Bureau also recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms." H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866). And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-909.

Commentators continued to interpret the Second Amendment the same way later in the century. One newspaper article argued that "pistols cannot safely be committed to every irresponsible hand," that the Constitution does not protect "the right of every drunken loafer to bear about in his pocket the implements of murder," and that the right instead belongs only to those "whom it was safe to trust with firearms." *The Sale of Pistols,* New York Times, June 22, 1874, at 4. Another article referred to the "constitutional right of every peaceable citizen to carry arms for his own defense." *Kansas Legislature: Some Criticisms on Pending Bills,* The Topeka Daily Capital, Feb. 2, 1883, at 6.

All in all, post-ratification sources point in the same direction as English and Founding Era sources. Although different commentators used different terms —

"peaceable," "well-disposed," and so on — they recognized that a legislature could disarm those who were not law-abiding, responsible citizens.

### 3. The Nation has a long tradition of disarming persons who are not law-abiding, responsible citizens.

"[T]his Nation's historical tradition of firearm regulation" further illuminates the Second Amendment's scope. *Bruen,* 142 S. Ct. at 2126. And the United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming persons whom legislatures have found are not law-abiding, responsible citizens.

Most relevant here, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for example, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic.[11] Similarly, after putting down Shays' Rebellion in 1787, Massachusetts

---

[11] *See* 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801,* at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619,* at 282 (William Waller Hening ed., 1821).

required the rebels, as a condition of being pardoned, to surrender their arms, which would be returned to them after three years if they kept the peace.[12]

Colonies and early States also punished irresponsible use of arms with forfeiture of the arms. Early American justice-of-the-peace manuals explained that the Statute of Northampton — which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn,* 5 Pet. 233, 241 (1831) — empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[13] Some 17th- and 18th-century American statutes expressly recodified that rule.[14] Others made forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[15] Although those laws

---

[12] *See* Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

[13] *See, e.g.,* James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[14] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[15] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674,* at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, §1, 2 *Laws of the State of New-York,* 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801,* at 209-210 (1906).

involved forfeiture of arms involved in an offense, rather than bans on possessing arms, they show that legislatures could restrict an individual's ability to bear arms if his conduct suggested that he would not use them responsibly.

A few decades later, States began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen,* 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen,* 142 S. Ct. at 2148 n.23 (collecting statutes). Those laws, too, confirm that irresponsible individuals were subject to special restrictions that did not (indeed, could not) apply to ordinary, law-abiding citizens. *See id.* at 2122 (holding a proper-cause requirement unconstitutional as applied to ordinary citizens).

Continuing in the 19th century, as guns became more lethal and more widely available, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. At least 29 jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages.[16] Several States

---

[16] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga.

banned the sale of guns to persons of unsound mind.[17] At least a dozen States

disarmed "tramps" — that is, vagrants.[18] Some States forbade intoxicated persons

from buying or carrying guns.[19] One State forbade the carrying of arms by "any

person who has ever borne arms against the government of the United

---

Laws 112; Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[17] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[18] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[19] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

States."[20] Another disarmed certain individuals in identified categories if they were "not known to be peaceable and quiet persons."[21]

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby,* 2 S.W. 468,469 (1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan,* 58 N.E. 572, 575 (1900).

The tradition of disarming unfit persons continued into the 20th century. In the 1930s, Congress disqualified violent criminals, fugitives from justice, and persons under felony indictment. *See* Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251. In the 1960s, Congress disqualified felons in general, drug users and addicts, and persons with mental illnesses. *See* Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82

---

[20] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.

[21] 21 See Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

Stat. 1220. In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452. And in the 1990s, Congress disarmed persons subject to domestic-violence protective orders, *see* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110401(c), 108 Stat. 2014, and domestic-violence misdemeanants, *see* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Div. A, Tit. I, Sec. 101(f) [tit. VI, § 658(b)(2)], 110 Stat. 3009-372. That series of statutes reflects Congress's longstanding judgment that "firearms must be kept away from persons *** who might be expected to misuse them." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983).

From the earliest days of the Republic to modern times, in short, legislatures have disarmed individuals who could not be trusted with firearms. Different legislatures have disarmed different groups at different times: loyalists and rebels in the 18th century; under-age individuals and persons of unsound mind in the 19th century; and felons, drug addicts, and domestic abusers in the 20th century. But those disqualifications all reflect the same enduring principle: The Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens.

### 4.    Section 922(g)(3) is consistent with the tradition of imposing categorical limits on the right to keep and bear arms. Armed drug users endanger society in multiple ways.

Section 922(g)(3) fits within this history and tradition because it disarms persons who are not law-abiding, responsible citizens. First, drug users may mishandle firearms—or use firearms to commit crimes—because of "drug-induced changes in physiological functions, cognitive ability, and mood." *Harmelin* v. *Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *see Florence* v. *Board of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression."). The effects of marijuana intoxication, for example, include an altered "perception of time," "decreased short-term memory," and "impaired perception and motor skills." National Academies of Sciences, Engineering, and Medicine, *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research* 53 (2017) (*Health Effects*).

Second, illegal drug users often "commit crime in order to obtain money to buy drugs"—and thus pose a danger of using firearms to facilitate such crime. *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment). In the years before Section 922(g)(3)'s enactment, President Lyndon B. Johnson and both Houses of Congress recognized that drug use often motivates

crime.[22] Supreme Court cases are likewise replete with examples of crimes

motivated by drug habits.[23] And in one study, around 20% of state inmates—and

nearly 40% of state inmates who were incarcerated for property crimes—stated

that they committed their crimes in order to obtain drugs or money for drugs. *See*

Jennifer Bronson et al., Bureau of Justice Statistics, Office of Justice Programs,

U.S. Dep't of Justice, *Special Report—Drug Use, Dependence, and Abuse Among*

*State Prisoners and Jail Inmates, 2007- 2009*, at 6 (rev. Aug. 10, 2020) (*Drug*

*Use*).

Third, "violent crime may occur as part of the drug business or culture."

*Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the

judgment). That violence can involve not only drug dealers, but also their

customers. For example, violence may result from "disputes and ripoffs among

---

[22] *See* H.R. Doc. No. 407, 89th Cong., 2d Sess. 7 (1966) (presidential message) ("Drug addiction * * * drives its victims to commit untold crimes to secure the means to support their addiction."); H.R. Rep. No. 1486, 89th Cong., 2d Sess. 8 (1966) ("Narcotic addicts in their desperation to obtain drugs often turn to crime in order to obtain money to feed their addiction."); S. Rep. No. 1667, 89th Cong., 2d Sess. 13 (1966) (observing that drug users can be driven "to commit criminal acts in order to obtain money with which to purchase illegal drugs").

[23] *See, e.g., Ramirez v. Collier*, 142 S. Ct. 1264, 1296 (2022) (Thomas, J., dissenting) ("the brutal slaying of a working father during a robbery spree to supply a drug habit"); *Andrus v. Texas*, 140 S. Ct. 1875, 1877 (2020) (per curiam) ("To fund a spiraling drug addiction, [she] turned to prostitution" and "began selling drugs."); *Wong v. Belmontes*, 558 U.S. 15, 15-16 (2009) (per curiam) ("bludgeoned [the victim] to death, * * * stole [her] stereo, sold it for $100, and used the money to buy beer and drugs"); *Smith v. Texas*, 543 U.S. 37, 41 (2004) (per curiam) ("regularly stole money from family members to support a drug addiction"); *Bell v. Cone*, 535 U.S. 685, 703 (2002) ("In an apparent effort to fund this growing drug habit, he committed robberies."); *Buford v. United States*, 532 U.S. 59, 62 (2001) ("robberies had been motivated by her drug addiction").

individuals in volved in the illegal drug market." Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Drugs & Crime Data—Fact Sheet: Drug-Related Crime* 3 (Sept. 1994); *see, e.g.*, Carrie B. Oser et al., *The Drugs-Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285, 1288 (Aug. 2009) ("A drug deal gone wrong may frequently progress to victimization and violence."). Guns increase both the likelihood and the lethality of such drug violence.

Fourth, armed drug users endanger the police. "[D]ue to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers," and such encounters "threaten the safety" of the officers "when guns are involved." *United States* v. *Carter*, 750 F.3d 462, 469 (4th Cir.) (citation omitted), cert. denied, 574 U.S. 907 (2014); *see Michigan* v. *Summers*, 452 U.S. 692, 702 (1981) ("[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence.").

Fifth, armed drug users endanger themselves. Most gun deaths in the United States result from suicide, not homicide. *See NYSRPA* v. *Bruen*, 142 S. Ct. 2111, 2164 (2022) (Breyer, J., dissenting) (noting that 61% of gun deaths are suicides and 37% are homicides). And drug users, including marijuana users, pose a higher risk of suicide than ordinary citizens. *See Health Effects* 311.

"Studies bear out these possibilities." *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment); *see United States* v. *Yancey*, 621 F.3d 681, 686 (7th Cir. 2010) (per curiam) ("Ample academic evidence confirms the connection between drug use and violent crime."). In one study, "over 60 percent of adult male arrestees * * * tested positive for some drug in their system at the time of arrest," and "a large portion of those arrestees tested positive for marijuana." Office of National Drug Control Policy, Executive Office of the President, *ADAM II—2013 Annual Report, Arrestee Drug Abuse Monitoring Program II*, at 38 (Jan. 2014). In another, 42% of state prisoners stated that they were drug users at the time of their crimes. *Drug Use* 6.

Judicial decisions, too, acknowledge the dangers posed by armed drug users. Many of the Supreme Court's decisions describe "drugs and guns" as a dangerous combination."[24] And multiple courts of appeals have recognized that drug users are likelier than ordinary citizens to misuse firearms.[25]

_____

[24] *Rosemond v. United States*, 572 U.S. 65, 75 (2014) (citation omitted); *see Muscarello v. United States*, 524 U.S. 125, 132 (1998); *Smith*, 508 U.S. at 240; *see also Johnson v. United States*, 576 U.S. 591, 642 (2015) (Alito, J., dissenting) ("Drugs and guns are never a safe combination."); *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment) ("[There is a] direct nexus between illegal drugs and crimes of violence."); *Richards v. Wisconsin*, 520 U.S. 385, 391 n.2 (1997) ("This Court has encountered before the links between drugs and violence.").

[25] *See Carter*, 750 F.3d at 470 (4th Cir.) ("[D]rug use, including marijuana use, frequently coincides with violence."); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("[U]nlawful users of controlled substances pose a risk to society if permitted to bear arms."), cert. denied, 547 U.S. 1138 (2006); *Yancey*, 621 F.3d at 685 (7th Cir.) ("[H]abitual drug abusers * * * are more likely to have difficulty exercising self-control, making it dangerous for

In particular, the Supreme Court's decision in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), supports Section 922(g)(3)'s constitutionality. That case involved a claim that suspicionless drug testing as a condition of promotion to certain federal jobs violated the Fourth Amendment. *Id.* at 659-663. The Court upheld the drug-testing requirement as applied to those who sought jobs that required them to carry firearms. *Id.* at 664. The Court emphasized "the extraordinary safety * * * hazards that would attend the promotion of drug users to positions that require the carrying of firearms." *Id.* at 674.[26] Similar hazards justify Section 922(g)(3).

Congress was not alone in disarming drug users and drug addicts. At least 32 States and territories have adopted similar laws.[7] That legislative consensus confirms that drug users are not, in fact, among the law-abiding, responsible

---

them to possess deadly firearms."); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing § 922(g)(3), Congress expressed its intention to 'keep firearms out of the possession of drug abusers, a dangerous class of individuals.'") (citation omitted), cert. denied, 562 U.S. 1191 (2011); *United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) ("[W]e see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so.").

[26] *See*, *e.g., Treasury Employees*, 489 U.S. at 670 ("The public interest * * * demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm."); *ibid.* ("[E]ven a momentary lapse in attention [by an employee carrying a firearm] can have disastrous consequences."); *id.* at 671 ("[T]he public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force."); *id.* at 679 ("The Government's compelling interests in preventing the promotion of drug users to positions where they might endanger * * * the life of the citizenry outweigh the privacy interests of those who seek promotion to these positions.").

citizens protected from disarmament by the Second Amendment. It also distinguishes Section 922(g)(3) from the outlier gun laws found unconstitutional in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010).

Finally, Section 922(g)(3) disarms a person only if he "*is* an unlawful user of or addicted to any controlled substance." 18 U.S.C. 922(g)(3) (emphasis added); *see Dickerson* v. *New Banner Institute, Inc.*, 460 U.S. 103, 116 (1983) (discussing the significance of the verb tenses in Section 922(g)). The disqualification thus applies "only so long as [a person] abuses drugs"; a user can "regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686-687. That limit makes Section 922(g)(3)'s constitutionality particularly clear. The Second Amendment protects the right to possess arms, but it does not entitle anyone "to simultaneously choose both gun possession and drug abuse." *Id.* at 687. And here the facts show that Hemani chose both gun possession and drug abuse — at the time the firearm he possessed was found he admitted to smoking marijuana about every other day. ROA.380-81.

### 5. This Court's decision in *Daniels* is flawed.

In *Daniels*, this Court reasoned that "a general notion of 'dangerousness'" could not justify Section 922(g)(3). *Daniels*, 77 F. 4th at 354. The court instead required the government to show that Section 922(g)(3) is comparable to a

"particular" "historical danger-based disarmament"—*i.e.*, to identify a "class of persons at the Founding  * * *  who were 'dangerous' for reasons comparable to [drug] users." *Id.* That analysis is unsound on multiple levels.

As an initial matter, the panel erred in reducing the inquiry into the Second Amendment's original meaning to a search for a specific historical analogue. The test set forth in Supreme Court cases "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. That inquiry into original meaning "will often involve reasoning by analogy" to historical statutes, but it need not always do so. *Id.* at 2132. The government has provided extensive evidence apart from historical statutes—for example, parliamentary and congressional debates, precursors to the Second Amendment, treatises, and commentaries—showing that the Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens. That body of historical evidence establishes that Section 922(g)(3) complies with the Second Amendment regardless of whether the statute mirrors a "particular" "historical danger-based disarmament." *Daniels*, 77 F. 4th at 354.

Moreover, even when the government defends a modern law by invoking historical statutes, it need only cite  a "historical *analogue*,  not  a historical *twin*." *Bruen*, 142 S. Ct. at 2133. In judging whether a modern law is "analogous enough"

to "historical precursors" to "pass constitutional muster," a court should ask whether the laws "impose a comparable burden" and are "comparably justified." *Ibid*. The government has identified many historical laws that impose the same type of burden as Section 922(g)(3) (disqualifying someone from possessing arms) for the same type of reason (the person is not responsible enough to be trusted with arms). To demand a closer match is effectively to demand a historical twin.

*Daniels*'s approach is especially inapt because Section 922(g)(3) addresses "novel modern conditions." *Bruen*, 142 S. Ct. at 2134 (citation omitted). As the *Daniels* panel itself acknowledged, the Founding generation was "not familiar" with modern drugs and thus "had no occasion to consider" whether to disarm illegal drug users. *Daniels*, 77 F.4th at 343-44. Because this case "implicate[s] unprecedented societal concerns," it requires "a more nuanced approach" than that applied by the panel in *Daniels*. *Bruen*, 142 S. Ct. at 2132.

The *Daniels* panel acknowledged that "history and tradition may support some limits on an intoxicated person's right to carry a weapon." *Daniels*, 77 F.4th at 340. More specifically, it stated that the tradition of prohibiting gun possession by persons intoxicated with alcohol and by persons with mental illnesses could support laws disarming drug users who are "currently under an impairing influence." *Id.* at 349. The court concluded, however, that the Second Amendment

does not permit disarming a drug user "between periods" of drug intoxication. *Id.* That, too, is incorrect.

The danger to society posed by an armed drug user extends beyond the risk that he will mishandle firearms while under the influence of the drug. As explained above, drug users use firearms to commit crimes that fund their drug habit, to engage in violence as part of the drug business or culture, to attack police officers who are investigating their drug crimes, and to commit suicide. Those risks justify disarming drug users even between periods of drug intoxication.

Even if a court considers only the risk that a person will misuse firearms while under the influence of drugs, Section 922(g)(3) would still comply with the Second Amendment. Drug users who possess firearms are apt to retain possession while under the influence. They are unlikely to put their guns away before using drugs and to retrieve them only after regaining sobriety.

The analogy between drug use and alcohol use does not support the reasoning of *Daniels*. Drinking was legal at the Founding and thus did not pose the same types of dangers as the use of illegal drugs does today. States, in any event, have long done more than ban gun possession while drunk. In the 19th century, many States enacted statutes allowing "habitual drunkards" to be committed to asylums or placed under guardians in the same manner as "'lunatics.'" *Kendall* v.

*Ewert*, 259 U.S. 139, 146 (1922) (citation omitted).[27]  The *Daniels* panel

recognized that, because " 'lunatics'" "could be wholly deprived of their liberty

and property, the government could necessarily take away their firearms," *Daniels*,

77 F.4th at 349, but the same is true of "drunkards."  In addition, at least one State

in the mid-19th century specifically disarmed "common drunkards,"[28] and many

States and territories today prohibit firearm possession by alcoholics.[29]

---

[27] *See, e.g.*, Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (District of Columbia); Ark. Rev. Stat., ch. 78, § 1, at 456 (William McK. Ball & Sam C. Roane eds., 1838); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358 (R. H. Clark et al. eds., 1861); Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of Mar. 2, 1868, ch. 60, § 5, *in The General Statutes of the State of Kansas* 553 (John M. Price et al. eds., 1868); Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2, at 523-524; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116; Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607-608; Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790; Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585; Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851); Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62; Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237; Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 94 (1856); Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1, at 431; Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local Laws and Joint Resolutions* 6 (1871); Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10; Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188; Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197.

[28] *See* Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

[29] *See* Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(8)(A); Colo. Rev. Stat. Ann. § 18-12-203(1)(e); Fla. Stat. Ann. § 790.06(2)(f); Ga. Code Ann. § 16-11-129(b)(2)(J); 10 Guam Code Ann. § 60109.1(b)(6); Haw. Rev. Stat. § 134-7(c)(1); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(13); Ky. Rev. Stat. Ann. § 237.110(4)(e); Md. Code Ann., Public Safety § 5-133(b)(4); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Mo. Rev. Stat. § 571.070.1(2); N.J. Stat. Ann. § 2C:58-3.c.(3); N.C. Gen. Stat. § 14-415.12(b)(5); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3); S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); W. Va. Code § 61-7-7(a)(2).

Nor does the analogy between drug use and mental illness support *Daniels*. It has long been understood that a person with a mental illness does not necessarily exhibit symptoms all the time. Blackstone thus defined a "lunatic" as "one that hath lucid intervals; sometimes enjoying his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765). And Coke defined a "[l]unatique" as a person "that hath sometime his understanding, and sometime not." Edward Coke, *The First Part of the Institutes of the Lawes of England, or, A Commentarie upon Littleton* § 405, at 247 (1628). The Supreme Court has nonetheless approved "longstanding prohibitions on the possession of firearms by * * * the mentally ill"; it has never suggested that the validity of such laws fluctuates with the remission and relapse of a person's symptoms. *Heller*, 554 U.S. at 626. Just as Congress may disarm persons with mental illnesses even during their lucid intervals, it may disarm drug users even during their sober intervals.

**6.    *Daniels* has significant practical (deleterious) consequences.**

*Daniels* has significant practical consequences. Section 922(g) "is no minor provision." *Rehaif* v. *United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting). It "probably does more to combat gun violence than any other federal law." *Ibid.* And Section 922(g)(3) is one of the most frequently applied of Section 922(g)'s disqualifications. Since the creation of the federal background-check system in 1998, it has resulted in more than 217,000 denials of firearms

transactions. *See* Crim. Justice Info Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *Federal Denials—Reasons Why the NICS Section Denies, November 30, 1998 – September 30, 2023*. In 2021, the most recent year for which statistics are available, Section 922(g)(3) resulted in more than 15,000 denials— more than any other provision apart from Section 922(g)(1), which disarms convicted felons. *See* Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System Operational Report 2020-2021*, at 19 (Apr. 2022).

Although this Court held Section 922(g)(3) invalid "only as applied to Daniels," *Daniels*, 77 F.4th at 355, its analysis did not turn on any distinctive characteristics of Daniels's conduct. The full scope of the court's holding remains unclear, but the concurrence found it "hard" to "avoid the conclusion that most, if not all, applications of § 922(g)(3) will likewise be deficient" under the court's reasoning. *Id.* at 357 (Higginson, J., concurring).

## CONCLUSION

Once again, the government recognizes that the arguments advanced in this brief are currently foreclosed by *Daniels*. But we invite the opportunity to provide further supplemental briefing, if appropriate, after the Supreme Court decides *Rahimi* and the pending cert petition in *Daniels*.

Respectfully submitted,

Damien M. Diggs
United States Attorney
Eastern District of Texas

/s/ *Bradley Visosky*
Bradley Visosky
Assistant U.S. Attorney
101 E. Park Blvd., Suite 500
Plano, Texas 75074
Telephone: (972) 509-1201

Attorneys for the United States

## Certificate of Service

I certify that on June 19, 2024, a copy of this brief was electronically served on counsel for the appellee through use of the Court's ECF system.

/s/ *Bradley Visosky*
Bradley Visosky

## Certificate of Compliance

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(f). It contains 9,762 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(g) and the type style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Word for Office 365 in a proportionally spaced typeface in 14-point size, with footnotes in 12-point size.

/s/ *Bradley Visosky*
Bradley Visosky